and Price Waterhouse Coopers. Mr. Chesler. Good morning. May it please the Court, Evan Chesler for the appellate. I'd like to reserve five minutes if I may. Your Honors, we have a significant number of matters addressed in the briefs and given time constraints I'm not going to try to address all of them. Obviously I'll answer whatever questions the Court has to the best of my ability, but I really would like to focus on three points this morning. And the first of those points is the prejudicial nature of the trial, the judgment from which we are here appealing. The fact that it wasn't severed? It was not, Your Honor, despite a request that it should be. And of course the key question at the trial was whether Coopers and Libram, the predecessor firm to Price Waterhouse Coopers, had negligently failed to detect the insolvency of Ambassador, which it was alleged was caused by the misconduct of Mr. Chait who had run the company. And of course the Commissioner sued both Coopers and Libram and Mr. Chait, and then Mr. Chait passed away and his estate was a defendant at trial. Now we asked for severance and the severance was denied. And the consequence of that was we tried this case for nine weeks sitting next to an empty chair, not represented by counsel. Much of the evidence at trial had to do with Mr. Chait's conduct in running this company. But wasn't the evidence also as to what the auditors did or didn't do? And wasn't the jury instructed that they had to find culpability negligence on the part of the auditors? Yes, Your Honor. And if they found that as a matter of their verdict from the evidence, how how was Chait's absence prejudicial? In several ways, Your Honor. First, because he was not there, his estate was not there defending itself, we were compelled to try to defend the allegations and proof with respect to misconduct that Mr. Chait engaged in. Something we would never do if we were trying only our liability separately. And at the end of all the evidence, right before the jury was sent off to deliberate, they were told by the judge upon the entry of default judgment that Mr. Chait was quote guilty of the misconduct that was alleged. So now the jury goes off and has just been told that the empty chair next to us, whose conduct we were forced to try to defend because this wasn't a severed trial, was guilty. In the face of that, the jury comes back and allocates the fault 60% for Mr. Chait and 40% for us. And unbeknownst to anyone in the jury, the judge then respectfully commits what we believe is error in misapplying the choice of law rules in New Jersey and we end up with a hundred percent of the liability. Now the cases are pretty clear, this is easily avoided. There would never even have been the arguable inefficiency here of two trials because Mr. Chait's estate defaulted. There would have been one trial, but it would have been a trial at which the jury would only have considered our liability. They would have had no knowledge about Mr. Chait being quote guilty and under Rule 55, if we had been found liable in a case in which we were the sole defendant, the damages would have been allocated by the court under Rule 55 subsequently. Of course that never happened because the jury came back as if it were two live defendants in the courtroom and allocated 60-40 and then the judge, under joint and several liability principles applying New Jersey law, we believe erroneously, signed all the liability to us. What were the reasons the judge gave for not severing? He just, in his discretion, felt that there was no reason to to do so. Did you object at the point, it seems to me there are two issues, it's not just severance, it's the fact that in the jury instruction he said although you were to accept for purpose of your deliberations that Mr. Chait is guilty of gross negligence and budget fiduciary duty in his role, I cannot stress this enough, you're not to assume the liability of Cooper's. That statement was essentially gratuitous because all the jury had to accept was that he defaulted. That's exactly right. There's no substantive finding at all of culpability on his part, nor was it necessary. Did you object to that charge? We did not object to the word guilty, we objected to the use of the word guilty, we objected to a procedure in which the judge was going to read virtually every assertion in the case against Mr. Chait, and the judge in fact said that would be prejudicial, I'm not going to do that. Well that's exactly the point here, it's equally prejudicial, perhaps more so in a sense, to use the shorthand, the guy's guilty, as you're going off to deliberate about the people who were sitting next to the empty chair. So we did object to that procedure, and most importantly, your honor, we objected to the joint trial because it was, we believe, virtually inevitable that if the two parties were going to be tried together with one in an empty chair, that we were going to end up suffering the prejudice. We couldn't call Mr. Chait, we did not have all of the facts that he had, we were his auditors. But you weren't going to be able to call Mr. Chait no matter what. But we wouldn't have been sitting there, accused jointly of this misconduct, and have so much of the evidence dealing with whether Mr. Chait was guilty, and then had, or liable, and then have the judge say he's in fact guilty. And as I say, the remarkable thing is the confluence of those two factors here, even after the liability 60-40, we end up with 100% of the liability. Wasn't it necessary for the jury to hear of Chait's wrongdoing in order to arrive at a percentage of fault? Well, I suppose if they were charged with the responsibility of allocating, it was, but had this case been severed, your honor, then the allocation would not have been done by the jury, it would have been done under Rule 55 by the trial judge. Now would they have heard some evidence of his wrongdoing in a case directed only at us? Yes, they would have. But it wouldn't have come in as against a co-defendant. Of course, if it weren't for joint and several liability, the decision to keep him in the case actually benefited you. Because your fault was determined to be 40%. Well, our fault was determined to be 40%, but then the court applied, we believe, erroneously. Well, the interest, but that's a different issue. Well, no, but then applied under choice of law, applied joint and several liability, so we have 100%. Why don't you spend a moment on that? Why was the district court wrong? Well, I believe, your honor, that... New Jersey law, as opposed to New Brunswick. Yes, I'm sorry for interrupting. We believe the judge was wrong, Judge Ackerman was wrong, your honor, because under the Ernie case, for example, and under the Farmore case in the Western District of Pennsylvania, it's clear that, first, the test is governmental interest. Second, each issue has to be determined separately and the choice of law made with respect to that issue separately. And third, the governmental interest is determined by what the state's governmental interest is today, currently. Now, currently in this state, in New Jersey, excuse me, the governmental interest is best exemplified by the current version of the statute, which would, in fact, allocate liability. And so had the court simply applied the law in a very straightforward way, what is the governmental interest of New Jersey? It's pretty clearly expressed by the state legislature in allocating liability here. The court would have said, if we're going to apply choice of law principles applying the governmental interest test, we should apply Vermont law to the liability of a Vermont insurance company here. And under Vermont law, it would have been a comparative negligence standard. The prejudice of the joint unsevered trial was exacerbated. It wouldn't have been cured, but it would have been mollified. It would have been ameliorated if, in fact, the result was we only bore 40 percent of liability in a case in which the jury found us 40 percent at fault. What is the principle that supports your position that New Jersey law at the time of trial applied and not New Jersey law at the time the act was committed? Yes, I believe if you look at the cases, the Ernie case as an example, the courts look to what the current expressed public policy of the state is. In this case, it's pretty clear because the statute's been amended long after the events in question here. And here today, even though we're not suggesting the court should apply the current New Jersey statute, but the court should look to the current New Jersey statute as the illustration of current New Jersey policy in using the governmental or applying the governmental interest test, which is the law in New Jersey for choice of law. When you say current, what date are you referring to? As of the time of trial. If the court had said, I am today going to apply New Jersey choice of law principles. That requires me to apply the governmental interest test, and I'm going to apply it to each claim. What is the current governmental interest of New Jersey on this issue? It would have looked presumably to the then current New Jersey statute, which would have allocated liability and said, well, I'm not going to apply joint and several liability, which was the policy in place many, many years before in the early 80s when the events in question took place. But this is a Vermont insurance company, and the state of Vermont's policy is to allocate under a comparative negligence standard. What other interest is there of Vermont other than that it's organized under the laws of Vermont? Well, I think there are many interests, not the least of which is that the oversight here, I mean, the whole issue in this case was whether my clients did or did not have an obligation and execute an obligation to bring to the attention of the insurance commissioner of Vermont, not New Jersey. Well, no, it was whether you had a duty, whether you were negligent, and whether the disclosure of that would have, I think it was a given or it was shown that the disclosure, if you had made the disclosure at that time, then the regulators would have gotten involved. But you didn't have a duty to bring them in as such. That's right. But my point, Your Honor, is the regulator we're talking about is the Vermont commissioner, which is a very strong governmental interest. If I may quickly just mention one. Greg, please put on five more minutes. Thank you very much, Your Honor. I said I wanted to make three points. Let me, if I may, just go to second and third very quickly. The second point I'd like to make, Your Honor, is the point of deepening insolvency. And on that point, we think it's very clear that there was no question here that the plaintiff sued for negligence by Coopers and Libran, and the plaintiff measured its damages by the deepening insolvency of the insurance company during the course of the events in question. And there is no question that under the SITEX case, this circuit's decision, in order to have a deepening insolvency claim, in that case applying Pennsylvania law, it must be based upon fraud, not based upon negligence. Fraud was not the theory that the plaintiff tried the case on. It was not the basis on which the case was submitted to the jury. And in the SITEX case, this Court said, you cannot use deepening insolvency as the measure of damages for a negligence case. And that's exactly what happened here. But this is not, there was, this is a cause of action against auditors for negligence. Yes, Your Honor. So the cause of action, it was not a cause of action based upon deepening insolvency, was it? It was a cause of action based upon traditional tort concepts. Yes, Your Honor. And in this case, based upon those traditional tort concepts, the plaintiff said its measure of damages for that negligence was the deepening insolvency of Ambassador during the events in question. It said that multiple times. But what were the damages made up of? Well, what they said. Actual harm caused, correct? Measured by the amount of insolvency that had deepened during the period in time. Not just deepened. It was unpaid liabilities, was it not? Well, it was, what they said was the company was already insolvent as of a certain date, beginning of 1982, they said. And the insolvency was calculated many years later at another amount. And they basically said the difference between those two amounts, the insolvency that we've allegedly failed to detect at the beginning of that period and the value of that insolvency later was, in fact, the measure of damages. There's no way around that. That's deepening insolvency. Has New Jersey in the NCP case said that this is permissible? No, Your Honor, it has not. What the NCP case said was examined was the circumstances under which the in pari delicto defense will be available to an auditor accused of negligence where there were multiple beneficiaries of recovery, some of whom were, many of whom were innocent stockholders and creditors of the insurance company. Well, I guess I'm talking about the superior court opinion where the court says whether the court terms it deepening insolvency or the gamut of discretion the term is meant to embrace, the bottom line is the same. Harm is harm. Where there is harm, the law provides a remedy. Yeah, all that's happened so far in the lower court, I think you're talking about the remand after NCP. I am. Supreme Court of New Jersey never mentioned deepening insolvency, never talked about what the standard was, never talked about the issues implicated in this court's Sit-Tex case. Is this on appeal? I do not believe so. I think that was simply a denial of a motion to dismiss. That's all the court was doing, saying I'm not going to, having just been told by the Supreme Court of New Jersey I shouldn't have dismissed the first part of the case, I'm not dismissing the second part right now. I'll deal with it when it comes up as trial judges often do. That's not a precedent for anything. When this court looked at the law in Pennsylvania in Lafferty, which Judge Fuentes, of course, is the author of, and in Sit-Tex, it didn't look at any particularized opinions in Pennsylvania. It applied what the court said were general, well-known principles of tort law, and based upon that concluded that deepening insolvency did not apply unless there was fraud involved, and it could not be the measure of damages in a negligence case. There's no basis on which to conclude that those principles of tort law, which we all learned in law school, are different in New Jersey from what they are in Pennsylvania. I wonder if that's the entirety of the thrust of the Commissioner, because I looked at the verdict sheet. Now, clearly the cause of action is professional negligence. Yes. That's in the complaint. They did not file a claim for deepening insolvency. Then I look at the verdict sheet, and the verdict sheet is a very straightforward four-part verdict sheet so that the first issue resolved by the jury was that there was negligence. The second issue dealt with proximate cause, and the third issue simply asked the jury to award damages. Yes. Now, deepening insolvency is not mentioned until the jury verdict. It may have been mentioned in motions and so forth, but as far as damages is concerned, it wasn't mentioned until the jury was instructed, but my review of the jury instructions was mentioned once. It was mentioned once, but the entire presentation by the plaintiff's damages expert, the one witness who testified on the subject, was explicitly the amount of additional insolvency that occurred during a defined period of time. It was the deepening insolvency standard, and counsel said multiple times on the record, our theory here is negligence with a measure of damages, that is deepening insolvency. Well, if that was the harm that was caused, and it is cognizable as harm that was caused, why is it wrong as damages? Because the simple answer is this Court has said so, Your Honor. This Court has said you cannot use deepening insolvency as the measure of damages in a negligence case. That's the holding incentive. I'm not sure, Mr. Chessler, that that's the way that the judge presented it to the jury. This is the jury instruction that I read, and I'll give you a chance to respond. This is at A-1505 of the appendix, page 34 of the instructions. And the judge instructed the jury as follows. The Vermont Commissioner's theory of damages is that because of Cooper and Librand's alleged negligent audit, Ambassador was permitted to continue to write new business until November 1983. During that time, the Vermont Commissioner contends that the insurance that it wrote produced claims that cost the company more than the premiums, plus interest and other investment income on those premiums it collected for that insurance. So the damages are essentially the claims that arose from the policies that were written after November of 1983, less the premiums that were paid. That's the measure of damages that the judge gave to the jury. Your Honor, the judge also said at page A-1505, your job as jurors will be to consider the evidence that the Vermont Commissioner has presented relating to Ambassador's insolvency and its consequences. And the entire presentation of the evidence, there are multiple very pretty, prepared, colorful charts about which there are pages and pages of testimony in the record from the plaintiff's expert, all laid out. Here's what the insolvency was at the beginning of Pricewaterhouse or Cooper's and Librand's alleged negligence. And here's what the adjusted insolvency is later. Adjusted meaning total insolvency minus about $18 million in unrecoverable legal costs. And the difference, the difference was precisely to the penny what the jury concluded were the damages here, right off of the plaintiff's charts. Weren't they straightforward damages that flow from a finding by the jury that there was professional negligence here? They are based upon the measure of how much did the insolvency deepen the company was allowed, here was the theory. Supposing, Mr. Chesler, that the judge had not mentioned the word deepening insolvency and simply instructed the jury, as I have just mentioned here, the difference between the claims and the premiums received. Why wouldn't that be a proper measure of damages? Because if it in fact is based upon a measure, which this was, of how much further underwater did the company go, already being insolvent, how much more insolvent was it afterwards? But that's not in the phrase that I just quoted. It was simply the amount of claims that were filed as a result of policies that should not have been written. But that's all Judge Ackerman gave to the jury. Now, he did mention deepening insolvency. He did mention it. I was about to come back to that, Your Honor. He did mention it. But equally as important, not more important, but equally as important, is in this case what I'm saying to Your Honor is that the record that the jury heard, the evidence that the jury heard, was that the payments of those premiums measured against the payments of claims, some of which were made and some of which were not made because they ran out of money. That's the consequence of the negligent conduct. It is the basis for the deepening insolvency theory of damages, Your Honor. And there isn't any mystery. I'm not putting words in their mouth. In the record, counsel said over and over again to the court, our theory of damages here is deepening insolvency. The judge said it to the jury. The plaintiff said it to the judge. I'm not trying to, after the fact, invent something that didn't take place. This court said that's not an appropriate basis for damages in a negligence case. Although we said in footnote 9 in SIDX, in any event, even CITES' counsel acknowledged that deepening insolvency as a measure of damages merely replicates malpractice damages. And if you can find the harm caused by malpractice damages, you don't need to worry about deepening insolvency. If there is no real harm and then you theoretically come up with this, ah, but on the books there was more insolvency. So the issue here, to my mind, isn't what you call it. It's was there harm caused by what happened. Right. And let me address that because we make that point separately in our brief. Here, the argument of the plaintiff is that the money is going to go to, as it will in the first instance, to the creditors and the policyholders. Under this court's analysis in Lafferty where you talked about the difference between harm to the company and harm to somebody else, that damage of money going to the creditors and the policyholders is not in fact deepening insolvency harm. It isn't. And what happened here is the plaintiff made a judgment, made a decision to sue for the company and said it is a deepening insolvency theory. When you look at the Lafferty opinion and the court enumerates, here are the things that could happen that would actually cause injury to the company. Things like additional administrative expenses and burdens in running our business. None of that was an element of this damages claim. So here the name matters because they applied a name which we believe doesn't even apply to the facts here. The judge told the jury that was the theory and the plaintiff's expert charts demonstrate that that's the theory. It is a measurement of the size of the insolvency as of two different dates in time. If that's not deepening insolvency, Your Honors, then I don't know what it is. You had a third point, Mr. Justice. I did, Your Honor. I'm very sorry. My third point is approximate cause. And very quickly, the same insurance company subsidiary run by the same fellow was the subject of litigation by the New York Department of Insurance. And in that case, the court came to the obvious conclusion that where the commissioner had never even read, let alone relied upon the audited financial statements of the same accountants, there could not have been proximate cause. The argument, I guess, is that a proper audit would have alerted them. That's the argument. And that's what I call the noise argument. If we had made some noise, they somehow would have heard it in the distance even though they weren't even statutorily to receive our statements until years later. And that was exactly the issue in the SIPC v. BDO-Sideman case in the New York Court of Appeals where the court there was confronted with a federal regulatory scheme that actually made this a more plausible argument. It was SIPC does not get reports from the auditors, but the SEC does. And the SEC is supposed to tell us if there's a problem with a SIPC member. And there, the Court of Appeals said, even there, you could not hold the accountants liable. No news is good news was insufficient as a matter of law, said the court, to trigger liability of an allegedly negligent auditor. If that wasn't enough, where there was a statutory scheme that said at least there was some other agency that was supposed to talk to them to whom we were supposed to talk, then how could it be adequate causation here where there was no such statutory scheme, where we never gave the reports to the commissioner, where the commissioner never even read them, let alone relied upon them, and the test is, is it a substantial factor in the injury? How could it be a substantial factor? But the jury heard the evidence and was, you're not objecting to the instruction that was given? We asked for a supervening or intervening cause instruction, Your Honor. And the intervening causes here were many. You asked for 7.13. You didn't ask for 1.4, did you? We did not ask for 1.4. 1.4 is the superseding cause. Well, we asked for what we called an intervening cause. If you look at the words of what we asked for, which the court rejected, the substance is the same. The court refused to give an intervening cause charge. And had there been an intervening cause charge, no one can predict what the outcome would have been, but the jury would have had a different template of legal standards in front of it from the one they had. It refused to give an intervening cause? Yes, Your Honor. All right. If you could, on your rebuttal, give me the appendix reference. Yes, Your Honor. You argued, in essence, before the jury intervening cause? Did we argue in front of the jury intervening cause? Yeah, meaning that the commissioner's failure to act. Well, we put into the evidence in the record the fact that the reports were not read by the commissioner. But this was a nine-week trial, Your Honor. There was all sorts of evidence before the jury. The whole point of the jury charge is to create, if you will, a template against which the jury can measure this mound of evidence and try to figure out what the legal standards are. And the court declined to give the intervening charge, intervening cause charge. Good. Thank you, Mr. Chesson. Thank you very much. Your Honor, on your rebuttal, tell me where the charge is that you wanted and where the court refused. Yes, Your Honor. If you can't find it, you can send us a letter to that effect. Mr. Whitney, we will give you 25 minutes. And you don't have to take it all, or you may even want a little bit more. I'm trying to remember all the things I wanted to talk about based on what I just heard, Your Honor. Richard Whitney for the appellee. First of all, with regard to the measure of damage, we referred to we had two measures of damage. One was the one we went with. The other one was our belt and suspenders that all lawyers have two alternate measures of damage, and that was the one we did not go with because we did not want to confuse the jury. Judge Ackerman let them present the second one in order to confuse the jury, I guess, and they were not confused, and now they want to confuse the court by comparing the two damage remedies. Neither one of them was what Mr. Chesler calls a measure of the deepening of ambassador's insolvency from point A to point B. Are the damages shown, are these pages relevant at all? I'm sorry, I can't see. The appendix, I'm sorry, the 362. Oh, yes, those itemize our damages. Could you explain exactly what the damages are? Yes, I can. Our evidence was that but for the wrongdoing of the defendants, the Commissioner of Insurance would have ordered Ambassador to stop writing any new or renewal business after 3-31-1982 with the latest and to put the company into a runoff. Our damages were, first, the net loss on the business that was written after 3-31-1982. Two, dividends that were paid up to Ambassador Group by Ambassador Insurance Company that would not have been paid. And three, the difference in operating costs for Ambassador between operating it as an ongoing insurance company and operating it in a runoff. A runoff is not a bankruptcy or liquidation. It's basically don't add on any new liabilities, pay off the claims you've got, and let's see if the time value of money will let you pay them off in full. It is not a measure of Ambassador's deepening insolvency. I'll give you some examples. But I think I've got that right, and I think I read the judge's charge to the jury correctly. I think you agree with that. But did you not argue deepening insolvency? In Lafferty, there are two concepts talked about, one of which is not relevant to this case, which is a deepening insolvency cause of action which arises in situations where there is an allegation of the wrongful acquisition of indebtedness. And what happens in a situation like that, if the element of the cause of action is met, the theory is you're entitled to the deepening insolvency, that is the balance sheet equity at the point at which you should have pulled the plug, versus the balance sheet equity at a later date. The problem in SITX is what they tried to do is take the – first of all, the court said, negligence isn't going to support that action. Then they said, well, all right, well, we'll just take that same measure of damage, cut it out of deepening insolvency, and put it into standard tort. And the problem is without the preface of the deepening insolvency cause of action, that becomes a tall order to prove as a matter of proximate cause in an ordinary negligence case. That's why we never presented what's called a comparative balance sheet measure of damage, which is the insolvency at point one and the insolvency at point two. You don't dispute the fact that if deepening insolvency had been the measure of damages here, you would have another case. If SITX would certainly suggest – If it applied in New Jersey. If SITX says basically a comparative balance sheet measure of damage is not appropriate in a state law negligence case, but it says that where that state law negligence case gives you a remedy for increased liabilities or diminished assets or lost profits, you may recover without regard to the solvency calculation. And that's why we talk about deepening insolvency below. And that is because these are damages that deepen the insolvency of the company, but they are not a comparative balance sheet of the full measure of those deepening insolvencies, which is what a deepening insolvency cause of action is looking for and what SITX has a problem with. In other words, it wasn't shown how badly Ambassador was going from point A to point B. Right, because that would include, for example, they say that at 1231.81 we proved it by hindsight, right, that the balance sheet was off by virtue of claims, losses that had occurred by 1231.81 by about $50 million. Those claims are going to come over the rampart between 1231.81 and the end of time, and they're going to deepen the insolvency because they're not accounted for in the 1231.81 financial statement. They're not in our damages. Investment losses are not in our damages. The problem with using comparative balance sheets outside of the context of a deepening insolvency cause of action is it requires the plaintiff's lawyer to prove that every tweak in a financial statement, asset and liability, has some causal nexus to the wrong you're claiming. Our damages are tethered to the wrong we're claiming. Who gets this money? The money ultimately goes to the creditors, which in Lafferty, that is the other part of Lafferty and the other element of Lafferty's deepening insolvency, and that's the issue we were primarily dealing with in New Jersey. The notion that they were claiming that once a company reaches the point of insolvency, it is no longer damaged. The damage belongs to the creditors, so a receiver suing on behalf of the company can't recover them. And Lafferty, before it ever gets to a deepening insolvency cause of action, says that essentially that's bunk. It basically says that the corporation can sue for those losses, those losses are its harm, and the fact that it's going to go right out the door instantaneously to creditors makes it no less a corporate cause of action. What are the unpaid obligations to creditors that this will affect? That is not known. As of 12-31-84, we did a calculation that they disputed, which was that the unpaid obligation was $125 million, but the evidence at trial and the fact is we continue to get claims because they were long-tailed business, and these claims continue to come in now 24 years after the fact. They continue to come in. And so the actual insolvency is greater. Plus, under the liquidation order, as the record also showed, the liquidation order undercompensates creditors because of when interest accrues and how the interest is calculated. That liquidation order is not governed by statute but by the order of a court that has continuing supervision. So you're saying Chait's estate would not receive any of this money? The record says that the only record reference is the question was asked, if you get more than you need, where will it go? And they said that was an unbelievable scenario. That's the record. I can expand beyond the record, but that would not be appropriate. I'd like to talk about that separate trial thing because there are two premises that Mr. Chesler made that are untrue. One is that the first couple of weeks of trial was only about Chait. It wasn't about Coopers. It was only about Chait. And secondly, it forced us to defend Chait. The nature of the claim against Coopers and Librand was essentially that on the basis of its audit plan and using standard and accepted actuarial principles, they knew that this company was actually insolvent or very near insolvency at year end 1981 and almost certainly was insolvent at the time of the audit. They had rejected management's methodology, which they had seen in prior years as being inherently unreasonable and were testing loss reserves using a standard actuarial method. Actuaries don't just do math. They test the reasonableness of that number based upon what they know about the business and what they know about what's happening in the industry. The reason why those numbers were real and known or should have been known by the auditor to be real is because Ambassador was growing a surplus lines business in a soft market. It could only do that by cutting its prices and writing lousy or business. That is a ticket for disaster. And since they knew they were growing and since they know that this is a product that is based on price, they know what's going on. But then what happens is they begin to negotiate away their findings to the point where they sign off on reserves that ultimately show that the company had actually grown its surplus from 1980 to 1981 when in fact their audit findings had been, it had chewed through at least $20 million of its $25 million surplus. Which brings me to why what Chait was doing was relevant. Because the evidence against Chait was one, growing his business in a bad market. Two, the fact that his underwriting operation was in chaos and his underwriting was non-existent. Facts that not only were knowable to Coopers but which Coopers should have been looking at if as they were, they were writing down the number based upon Chait's claims that he was writing better business now. Let me stop you here. The evidence as I recall was that Chait and who was the PricewaterhouseCoopers? Malvasio. Paul Malvasio. They were working together basically. They had a relationship. Well, yes. They were the two primary actors in what was going on, correct? Yes. And it's one thing to say that Chait's conduct was X, that he did this and he did this. But it's quite another for the court when he's instructing the jury, to instruct the jury that Mr. Chait is guilty of gross negligence and breach of fiduciary duty in his role as Director and Officer of Ambassador. And that conclusion that the jury is to take as a matter of fact, of law, that has to color the jury's view of what was going on here as compared to the court saying there has been a default entered because Chait did not appear. Your job is not to decide what he did or whether it was culpable. Your job is to decide what Coopers did. But he didn't say that. He told them he was guilty of breach of fiduciary duty. Isn't that something that when the jury goes into the deliberation room, they have to put that at the top of the deliberation pad as, well, he was guilty of breach of fiduciary duty and he and the other guy were in cahoots. So, I mean, isn't that prejudicial? I don't think so, Your Honor, because the instruction did not end there. I don't have it in front of me. I thought I brought it with me. But it was essentially having said that, let me emphasize, and I think he said, I cannot emphasize enough. I cannot stress this enough that you are not to assume the liability of Coopers and Libran. So they wouldn't assume it, but it's pretty heavy duty. Well, there's two sides to that, I guess, Your Honor. The other side is that from the standpoint of prejudice, perhaps the jury is going to decide, well, he's got a scalp. What do they need with the auditor? If Chait is guilty of breach of fiduciary duty, what are we looking at Coopers for at all? This argument can go either way. All he can do is instruct the jury based upon entering a default judgment against one and making clear to them that they're not to consider Chait's liability and assessing Coopers and Libran's liability. Well, they did say that. He said you are not to assume the liability of Coopers and Libran. I don't think he said you're not to consider it. Well, I have to disagree. I think the meaning of that instruction was to tell the jury that Coopers and Libran is separate in this consideration from Arnold Chait. If we had tried these cases separately, we would have had to try this case not twice but three times, first to establish the liability of Chait, then to establish the liability of Coopers, then to allocate liability between the two of them. Why would you have worried about the liability of Chait? Because you have to allocate liability under New Jersey law between all of the actors. It wasn't just Chait and Coopers and Libran. It was Mrs. Chait, Richard Tafro, and Ambassador Group as well, and the commissioner. The jury is required under New Jersey law to parse all of these things out. They have to be done under New Jersey law, and the verdict form does that. Does joint liability apply because of the year that the incident occurred? Joint and several liability. Yes, Your Honor, and that goes to the question of what was New Jersey's policy, because New Jersey in 1987 slightly changed joint and several liability, and later on it completely changed liability in 1995, but in both instances it did not make it retroactive to cases pending at that time. That's a policy decision. Why is that significant? Because they're arguing two things. One is that somehow NPC doesn't apply because NCP had a contribution statute and we don't. We do have a contribution statute. It was applied here. Joint and several liability is different from contribution statutes. It's a different policy, and that is it's deciding who bears the risk of loss. The second thing is when they decide to change the law of joint and several liability, they're making a policy decision. When they decide, however, that it's not going to apply to pending cases, they're making that policy decision, too, consistent with their other policy decisions. All of these arguments. What about the Ernie case decided by the New Jersey Supreme Court? Why isn't that the best evidence of how New Jersey would view this? Because Ernie did not involve, as I recall it, a case in which the lawsuit predated ambassadors or New Jersey's change. I may be forgetting the Ernie case. I thought it did. I may be forgetting the Ernie case. I'm sorry. Well, it seemed to me that that was the strongest argument in brief, an appellant's brief as to why current law should be applied as opposed to the law that was in existence at the time the alleged fraud or negligence occurred. Well, I do not recall Ernie to suggest that Ernie was looking at comparative policies between New York and New Jersey, and there was a question about whose law governs. And it did not involve precisely this same fact, but I apologize to you. I've just drawn a blank. No, you're correct. It did not involve precisely the same fact, but it did seem to have involved policy choice by the New Jersey Supreme Court as to whether they were going to apply current law or the prior law, and they opted for the current law. Well, here the policy choice would be with regard to the law that is applicable to this case versus Vermont's law, and Ernie does not stand for the proposition, as I recall it, that you ignore what law governs a particular case and instead apply current policy in deciding the choice of law question as to whether it is between this one and that one. And as I also recall, Ernie did not involve or Ernie involved different conflicts principles than the principles that were implicated in the ambassador case because in ambassador, the only contact that Vermont has is that the commissioner is from there, but a joint and several liability statute is about defendants, and it's about how you deal with defendants who are Vermonters or defendants in a case where the cause of action involves in Vermont or a case in which the wrongdoing occurred in Vermont. None of those things were true. All of those things pointed to New Jersey, and as Judge Ackerman pointed out in his post-trial opinion, this was not the first time that they had simply scouted for a law that looked like it was better for them than New Jersey law, and that was absolutely true because in New York or in the context of statute of limitations, they reached back trying to get New York law. So it was basically decide which law governs. The last thing I wanted to say, Your Honor, I guess, was the language of SITX that's applicable to this case is that language that speaks to an independent cause of action giving rise to a liability or giving rise to a cognizable claim under state law, which is the court said those claims are recoverable without regard to the solvency calculation. That's really consistent with what Lafferty says at the outset before it gets to the deepening insolvency cause of action, and that is what we're saying is we don't like the – you can't just take balance sheet at point A and balance sheet at point B, and I want to say subject to what Judge Rendell said during Mr. Chesler's argument, you know, there's that NPC trial court case out there that says that they're not sure that Lafferty or SITX comports with New Jersey law, but it doesn't matter because nobody claims this is a deepening insolvency cause of action. They say you cannot just take that comparative balance sheet measure, which comes from a predicate of a deepening insolvency cause of action and proof that the person knew when he took out the debt, blah, blah, blah. You can't just take that and apply it willy-nilly to any negligence case because standing alone, it's not a harm and it's not a measure of damage. That's not what we did. Most emphatically, when Mr. Chesler says this is what our measure of damage is, that isn't what our measure of damage was. Thank you, Your Honors. Mr. Whitney, thank you very much. Any other questions? Good, Mr. Chesler. Yes, Your Honor. Several points, Your Honor. First, Judge Rendell asked for citations during my main argument. Let me provide those, if I may. The proposed instruction is at A419, and our written objection to the jury charge is at A453, and the court overruling our objection is at A1535. Thank you. Second, Your Honor, you asked counsel about the record on money going, the excess money going to Mr. Chait. I listened carefully. I didn't really hear an answer to that. Let me fill that in. In fact, the plaintiff put into the record the total insolvency of Ambassador. It's at A436, among other places. It's in a number of places, as $107 million. And the recovery is $119 plus, and then there's additional interest on top. It's about $190 million. The amount that's going to go to Mr. Chait's estate is clear. The insolvency is $107 million. That's how much is owed to debtors, to creditors, excuse me, and shareholders, and anything above that is going to Mr. Chait. How about future claims? Well, I think the future claims were factored in. In the damage analysis, there was an effort to value what those future claims, some of them, believe it or not, even after all these years, have not been paid out. It was in the calculation. Ambassador, I'm guessing now, but Ambassador wrote pollution policies or? I don't know, Your Honor. I'm sorry. I'm wondering why claims are flowing into it. Oh, well, yeah. Well, there were asbestos, for example, asbestos claims. Yes, yes. Next point, there was some question about the facts in Ernie. Let me just clear that up very quickly. There was a statute in New Jersey in 1974. That was the joint several liability statute. There was an amendment in 1987, and there was an amendment again in 1995 for the current statute. The facts in our case arose in the period between the 1974 statute and the 1987 amendment. The facts in the Ernie case arose between the 1987 amendment and the 1995 amendment. And what the court did in Ernie was to look to the policy in the post-'95 period to decide what law should apply to the events that had taken place before'95. It's the second of the three periods, but it's exactly the same principle. The events took place before the current statute, and it looked to the current statute as evidence. What about the fact that when the New Jersey legislature amended the statute, they didn't make it retroactive? That's true, Your Honor. But that would only apply if, in fact, you were applying New Jersey law to the circumstances. This is a choice of law question, not application of Jersey law. If I may, just quickly, one other point. If you were right about that, what does that mean? Does that mean that your damages would be 40% rather than? That's right. If the court did not credit all of the other arguments we've made for judgment or a new trial, at a minimum, it would result in the damages being reduced to 40% of the amount, yes. Last point, the question of what the measure of damages was here, and there's a disagreement between us, but I want to see if I can clear it up in a second. As we pointed out in our reply brief at pages 7 to 8, the Sit-Tex case was not, in fact, a case where the damages were measured by the difference in two balance sheets, as Mr. Witness just suggested. The damages measure there was exactly the same as here. It was stock and, in that case, stock and debt, not just debt, that was issued after the alleged insolvency took place. It was exactly that measure, which the court said could not be the measure for a negligence claim. It wasn't a balance sheet as of two different dates. As to what the measure here was, the measure here was the total insolvency, plaintiff claimed, was $125.3 million, and that's, among other places, in the pretrial order. They then reduced it by $18.3 million, which was litigation expenses that couldn't be recovered, which comes to $107 million. That's where the so-called adjusted insolvency comes from. What they did was they said, all right, you started with $125 million. That was the insolvency. I'm deducting $18 for the litigation expense. That gets to $107. Now I'm going to compare that $107 adjusted insolvency to the insolvency that existed as of the beginning of 1981 when you, we, should have found out, supposedly, that they were insolvent. That's $21 million, and that would leave $86 million as the damages. If you look at the record at page A1886, which is one of the pretty charts I mentioned before, the $107 million which was shown to the jury is right here in the record. The expert report is exactly the same number that you get by simply taking total insolvency, reducing by unrecoverable litigation expense, and saying that's adjusted insolvency. So they were doing exactly what this court said in Sit-Tex they cannot do, and Sit-Tex was doing exactly what this court said in Sit-Tex you could not do. It's the same thing. Call it whatever you want. They used an inappropriate measure of damages in a negligence case, and therefore, among other reasons, the judgment below should be reversed. Thank you very much. The case was very well argued. We would like to have a transcript made of the argument, and I would ask the parties to share the costs of that. Yes, we are. Good. We will take the case under advisement. We thank counsel very much. Thank you. Please rise. This court stands adjourned until tomorrow, Wednesday, September 12th, 10 a.m.